We'll go ahead and call the next case, United States v. Jeffreys. All right. Mr. Donovan's getting set up over there. Mr. Roush, can you hear us okay? I can, Your Honor. Thank you. All right. Give me one second here. Make sure Mr. Donovan is all set. Mr. Donovan, you ready to go? All right. Mr. Roush, whenever you're ready. May I save two minutes for rebuttal, Your Honor? Watch the clock, but you may. Thank you, Your Honor. You may proceed. Thank you, Your Honor. May it please the Court, we're here today to talk about restitution payments and what defines a household. It seems that everybody's in agreement that the economic unit test should be the prevailing theory. We agree with that. The State agrees with that. The underlying Court agreed with that. Does that make it correct? No. That certainly does not make it correct or the correct standard. That's what everyone seemed to feel like that it was appropriate in this case. I see. You're excluding present company. You're excluding yourself from that. I just wasn't clear. No, I'm not excluding myself. It seems like everyone agrees that that is the appropriate remedy. So that seems to be what the argument is over, what constitutes the economic unit. The other tests could be applied, the tax tests, the heads-on-beds tests. They're a lot simpler, but they don't seem to fit this fact pattern as well. The economic unit test, as outlined by the Court that's cited in Johnson v. Zimmer, talks about whether the person's income and expenses are intermingled or interdependent. The factual record in this matter talks about the extent that Mr. Jeffries went to not commingle his finances with his live-in significant other, roommate, whatever you want to call it. The second part of that test laid out is the extent to which that household member increases the debtor's current monthly income. That's the second prong of that. With the extent that the defendant has gone to not intermingle his finances, the question to the court is, does someone get to choose whether or not to be in a household? The court felt that him choosing not to be a household and going to that extent was a sham. The record shows that Mr. Jeffries sought input from accountants, the probation department, the flu unit, to make sure that he didn't accidentally create a household and went to those extents. That was acknowledged by the prosecution in his response that there was efforts to separate the households, but that there was an underlying physical nature of the relationship as well. That begs the question, is the physical nature of the relationship what dictates in this matter? Is it because someone is sleeping with someone else? Does that necessarily create a household? The analysis from the court and from the state seems to indicate because there's more going on, and I hate to say under the covers, but whether or not they're roommates or live-ins, the living situation should have no bearing on whether or not their incomes and their expenses are intermingled or not. Mr. Rausch, I'm not sure that's quite a fair description of what the district court said, because I take the point, and you're quite right, that Mr. Jeffries is entitled to structure his affairs in such a way as to minimize his repayment obligations. But I think what the district court said is a lot of the evidence that he is not, in fact, commingling his assets or sharing expenses came from his statements about what he was doing. And the district court said it didn't believe him that there was an express adverse credibility finding. So if we don't believe Mr. Jeffries' statements about not sharing assets, separate payments for expenses, then how can we say that the district court abused its discretion in finding that these two people who are living together seem to share or are in business together, that it's reasonable to treat them as one economic unit? Because the facts aren't there. The judge says, I don't believe you, but there's nothing to go against the factual record that was laid forth to the court. The record shows they're paying separate expenses, separate bills, separate credit cards, separate incomes. He's paying rent that she's paying tax on. The whole record goes through there. And at the end of that, there was a cross-examination that didn't un-controvert any of those facts. And the court says, I don't believe you because prior to that, and the court's specific quote is, the court finds the defendant's assertion that his cohabitant and co-defendant is merely his roommate and employer to be disingenuous and not credible considering the defendant's own admissions, both at the hearing under oath and in previous filings with this court, that he and Ms. Stiltner are in a long-term close relationship in which they live and work together. Mr. Jeffries never said he didn't live with her or they have another relationship going on. We focused on the test and the economic unit and their intermingling. The court then says, no, because you're saying that you're applying this test, this is a sham, and I don't believe you. But the record does not support that, not one bit, not one iota. The facts that are pointed to, as the prosecution did, I think a better job of analysis in its brief, says, okay, well, there's a picture out there that has a family business and a picture up there. Well, that's not part of the test whether or not they have a website, whether they name the business after Jeffries or not, whether they're partners even, whether they're actual partners. Well, I thought part of the test is the extent to which they co-own assets, right? And if we infer from the way they talk about the tree business that it really is in part his business, then doesn't that co-ownership of a significant economic asset support the district court's conclusion? Well, first, the record doesn't support that because he's getting a paycheck, he's paying taxes on that, she's paying taxes on the rest of the income that comes into the business. They created an entity, and that's how they created the entity. There's no testimony in the record saying that this is his business, whether it's named after him for marketing purposes or not, has nothing to do with income and expenses. It doesn't say assets. There's no inquiry into who owns the assets, who paid for the assets. There is on the record that Mrs. Stiltner's mother was a part of the funding of the project, and thus, Mrs. Stiltner has it. And so, absent some evidence on the record, any—I'm sorry. Let me just—I'm sorry. I didn't mean to cut off Judge Miller. Judge Miller, did you— No, please, go ahead. Oh, thank you. I'm sorry. So, Ms. Stiltson has her own restitution requirement, correct? She does. Okay. And that's joint and several with Mr. Jeffries, right? That is correct, Your Honor. So, you know, this whole economic unit idea is a little bit confusing to me. I mean, basically, he's supposed to be paying 20 percent of his, you know, household income for restitution, right? Yes, Your Honor. Is any consideration given to her independent obligation to make restitution payments?  Well, is the idea that the income that she brings in— is the idea here that the court incorporated that into the court's calculation of household income? She pays restitution on her income coming in, and that's part of our argument, that there's almost a double taxation going on here. Her income's factored in, and then her entire income, even though the test says the extent to which the household member contributes, she will be included. They included her entire wage, and that's the second part of our argument, that he simply can't afford to pay two restitution payments plus hers. And then if hers is recalculated, potentially that would include his, and then he would be double taxed on his income on her restitution award. And that's the absurd result here when it comes down to it. Have you found any case that supports the economic unit test as appropriate test in a restitution case, as opposed to a bankruptcy case? So why are you convinced that that's the right standard? Again, that's what we went off of. The heads-on-beds test was too over-encompassing, because any homeless shelter or men's shelter that someone goes into, there's 1,000 heads-on-beds. We have to modify that. We don't know what the test is. How hard is it to just figure out the guy's income and look at all sources of that income, put him under oath, ask him what his income is, and to the extent he receives income from his domestic partner or whatever the relationship is, factor that in, and that's it. What's so complicated about that? It sounds easy when you put it like that, Your Honor. It's not complicated. That would be a very simple way to do it, to take the tax returns, find out what the income is, and if there's as well as we know for the record that they've been analyzing both Ms. Stiltner's, the flu unit has been analyzing Ms. Stiltner's and Mr. Jeffrey's tax returns. If they were hiding income or sheltering income, they would know it. They've been completely honest and forthwith about that. So that would be an easy way to do it, especially here. The district court didn't think he'd been completely honest. I said the district court did not think he had been completely honest about describing the financial arrangement that he had with Ms. Stiltner. You can make the argument, but you have to convince us that the court, on that point at least, I think we're reviewing for clear error the district court's finding. I would just challenge this court to find out where Mr. Jeffrey's facts were actually controverted. You can't say something's true when the facts don't support it. I think that's the third part of our argument is we think this should be remanded to a different judge. That testimony never appeared. They're analyzing his tax returns. They're analyzing her tax returns. He's being forthwith about everything. He's talked about his relationship and multiple things. He's not hiding it. If anything, we put emphasis on the fact that they were roommates and things, because that was what we figured the economic test would be. That was us, not Mr. Jeffrey's, doing the briefing for what we thought was appropriate. He's never hid anything, and I don't think there's anything in the record that says he does. So she says he's dishonest because he has tried to follow this non-commingling aspect of his life. That doesn't make him dishonest. Just as much as using a tax return, going by a hybrid vehicle or tax planning makes me or anyone else dishonest. Mr. Jeffrey should be allowed to plan his career, his life, his livelihood, his household, and he shouldn't be forced into a household because he's sleeping with someone. I've gone way over time, Your Honor. I apologize. No, that's all right. You've had a fair number of questions, so we'll go ahead and give you one minute for rebuttal, okay? Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Brian Donovan on behalf of the United States. Mr. Jeffrey owes over $9 million from an immense amount of fraud, ranging over several years. He's currently paying $513 a month, and at that rate, it would take him more than 1,472 years to pay off his restitution debt. That is not going to happen. So what the question before the district court was, what is his fair share? How do we maximize his fair share of restitution repayment? District Court, in its order in the judgment, requires him to pay 20% of the net household income, not just net individual income, but net household income. So the question then becomes, what is a household and how do we define it? Judge Pragerson has some very valid questions about the economic unit test and why we adopted that test. There simply is, as far as the parties could find, not a case out there that has analyzed the definition of household within the restitution context. The reason we landed on the economic unit test is it's kind of a similar analogous situation in a bankruptcy court where there's creditors and we're looking at what money is available to the debtors for repayment. It provides flexibility. It's one of the things that's highlighted in the cases that discusses this. It looks at the extent to that people are intermingled, interconnected, interdependence are some of the factors they look at. And I think that cuts both ways. It cuts a number of ways. It's one, what is their income coming into their bank account? But also, in what ways are their expenses or other standards of living either enhanced or reduced expenses-wise when they are operating as a household unit? You can easily see the situation where a criminal debtor has a very small balance in his bank account. I'm sorry to interrupt. That's not really what happened here. We weren't really looking. The court didn't really look at expenses. I mean, the problem with expenses is they're easily manipulated. The beauty of just 20% of income is you eliminate all the possible shenanigans that can go on with running up big credit card debts and all of the other things. So, I'm just concerned about this test sort of ab initio because if somebody kicks in money, a child works to put together money for college, that becomes part of the equation. It just seems convoluted to me. So, help with a little clarity if you could. I think part of the reason this test, I think, has some flexibility, and if the court were to have a different definition of household, that's certainly available to the court. We could not find one that does a good job of accurately capturing how you would look at the economics of a household. Tax filing, looking at the number of dependents, is easily manipulated and can be very narrow. Looking at heads-on-beds approach, which is the way the census treats it, is probably way too broad because then you do have things like traditional roommates in a traditional sense who have no connection with another party who's living in the same household. So, I think in this case, we're looking at the specific facts. We're looking at who Ms. Diltner is in relationship with Mr. Jeffries. I think the court looked a lot at his credibility on that regard. This is not just some roommate, and the court took, I think, great umbrage with the description of her as his roommate. This is a person he's been in a long-term relationship with. He committed the fraud together with it. They were so interconnected that they committed criminal contempt while under the indictment for the initial fraud because they would not stop contacting each other while in jail and contacting each other through third parties. They've lived together. He has described her as his fiancée, even has gone so far as, in filing with probation, described her as his wife. They run a business together called Jeffries LLC, which is in his last name, not Ms. Diltner's. They run it out of their shared house. It's a nice house that they rent together. Yes, he contributes to the rent, as fiancée couples traditionally do. They share the same rooms. They share the same living spaces. This is not looking at somebody who's disconnected from the defendant and including their household income. And partly I think what the court was concerned about in terms of his credibility is the incomes generating this, generating the business, excuse me, is generating income into the household. He's receiving a salary for that, and then there's excess income out there. The household together is making about, at that time, from what we could tell, about $10,000 a month in household income. His income that he claimed was about $4,000, maybe $5,000. I don't have the exact numbers because they kind of shifted. So what the court was looking at is what is this money coming in for this jointly run operation, jointly run business that they're engaged in, and that was a big part of the court's finding. I think it goes a lot to the credibility of the defendant, whether she believed his statements. There was a question asked about what happens to the excess income, and he claimed not to know. It's a business that they tout as family-owned and family-operated, yet he claimed that he had never even looked at their website and didn't know that they were claiming they were family-owned and operated. There's a number of other inconsistent statements, and that credibility finding, as Judge Miller said, is entitled to an incredible amount of deference to make that finding during the cross-examination and the evidence presented at the underlying stage. We also need to look at this in the larger context of the abuse of discretion standard that we need, that the court has to apply here. This may be a close call. It's a difficult case. If he clearly had a bank account with a lot of income coming in here, we would not be in this situation. If they were clearly roommates that didn't have any economic ties together, any relationship ties together, we wouldn't be in front of Your Honors either. This is a close call, and the abuse of discretion standard, I think, needs to be considered here, that this is not fanciful, arbitrary, unreasonable. It's not against clear logic or clear error. Some other parties may look at this and come to a different conclusion, but that doesn't mean that the court abused its discretion in determining these facts. Can I just add one thing? Mr. Jeffries could always go back to court and say, I can't make it, it's not working, and ask for reconsideration of the amount of restitution. There's no finality when it comes to that issue, correct? That's correct, Your Honor. The MVRA 3664K provides that opportunity to continue to return to the court, both while on supervised release and post-supervision. Mr. Jeffries is on supervised release right now, to ask the court to amend the restitution payment, to change it based on its economic circumstances. And then I would like to address Your Honor's point about whether consideration was given to Ms. Stiller's own restitution obligations in this case. She's paying currently $500 a month. Collectively, what they're paying today is far less than what the court ordered, because he's not yet paying the $2,000 a month. But there was consideration, at least in the government's briefing to the district court, that the court should take into consideration Ms. Stiller's own restitution obligation. And Ms. Stiller not being on supervised release, the government would have the ability to adjust Ms. Stiller's restitution obligation to account for any increase in Mr. Jeffries in order to balance them out. So I don't think that the double taxation issue that opposing counsel raises is a concern here. And then I guess I would like to finally get to the question of recusal. The court has made two adverse findings against Mr. Jeffries, one on his request to early termination of supervised release, and then this one. I don't think either of those rise to the level of the unusual circumstances that would require reassignment upon remand. Simply making a credibility finding, in part based on his prior pleadings to the court in his early termination motion, it does not mean that the court is biased against him or that the unusual circumstances of the Sears-Robot test are met for reassignment upon remand if the court were to remand this issue. If there are any other questions? Looking to my colleagues? Okay. Thank you very much. We'll rebuttal one minute. You may proceed when you are ready. Thank you, Your Honor. Briefly, they talked about being more than a roommate. That's in the bedroom. They're not married. They're not engaged. They are, in fact, having relations that shouldn't be considered here. But, counsel, you say they're not engaged, but there's a pleading where he said that they were engaged. Why can't the district court find no? I think that's a mistake. He called in to check on whether or not he should get married or not. His testimony is that he's considering getting engaged. But whether he is or not, it's still whether they're engaged or not shouldn't be part of the test. We say he's not. He testified he's not. No one said, oh, yes, you are. There's no paper that says, yes, you are. Move forward quickly. They said inconsistent statements. I see no inconsistent statements in this record. None. As far as the 20%, the other option is to pay 38% in a tax bracket. They're not hiding income. He can return to the court. Yes, he can return to the court, but he did. We laid out a budget in our initial brief showing that this was going to put him underwater. We used IRS standards and his own standards to show at rent costs what he was paying, and that was largely not taken up by the court or discussed at all. Again, the record 99 shows, and those pages are with, show the entire budget. And then he's not paying what we think he should. We've agreed with the government that until this is finished, we've stipulated that there will be no increase in the payments. So to say that he's just not voluntarily making those payments is kind of not exactly correct. We're waiting for a decision here as to what is appropriate. Back amounts will be paid. If I could just jump in here, because we have to write something in this case, and I want to make sure that it's accurate. I thought that your client in his motion to terminate supervised release early said or referred to her as his fiancée. He wrote that in his motion to terminate supervised release. Is that not accurate? I don't recall that. Because the district court's order quotes that sentence, and I went back and looked at it, and that's what I thought it said as well. So I want to just make sure. Earlier you said he did not say that. I could be mistaken. I do not remember that. They're certainly not engaged at this point. As to what he's told me and what I believe in talking to both of them, they are not currently engaged. Can I just follow up on that real quick, if that's okay? Of course. So, you know, it seems to me we're sort of shading a little bit into the equity concept of restitution. And the court, I think, was trying to look at it holistically and sort of get away from labels about marital status, you know, co-mingling, all of the sort of more technical aspects of defining a relationship in the sort of modern era. It's hard to do. And it seems to me that sort of given the fact that the labels are amorphous, they can change, I'm not sure what they mean. You're really just sort of looking at the credibility of the household economic unit in terms of, you know, the ability to pay restitution. Does that make sense to you? Yes, sir. Okay. Thank you. I have no further questions. Yeah, and I was about to pull that up. I believe the passage is on SCR 75 in the motion to terminate supervised release where there is the statement saying, please terminate my supervised release. I'm with my fiancee. But we understand the arguments from both parties. We appreciate them both. Thank you for your briefing and argument. This matter is submitted.
judges: OWENS, MILLER, Pregerson